**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**


AA SUNCOAST CHIROPRACTIC CLINIC, P.A.,
PALM HARBOR-WEST CHASE MEDICAL
GROUP, P.A., d/b/a Tampa Bay Spine Specialists,
and SPINAL CORRECTION CENTERS, INC.,
on behalf of themselves and others similarly situated,

      Plaintiffs,

v.                                    CASE NO.  8:15-cv-2543-T-26MAP

PROGRESSIVE AMERICAN INSURANCE
COMPANY, PROGRESSIVE SELECT
INSURANCE COMPANY, and
THE PROGRESSIVE CORPORATION,

      Defendants.
_____/


# O R D E R

    **BEFORE THE COURT** is Plaintiffs' Motion for Class Certification with exhibits

(Dkt. 80), Defendants' Memorandum in Opposition with attached exhibits including

Defendants' Statement of Facts (Dkt. 118), and Plaintiffs' Reply (Dkt. 121).[1]  After

careful consideration of the allegations of the Second Amended Complaint (Dkt. 22), the

submissions of the parties, and the applicable law, the Court concludes that the motion

should be granted in part and denied in part.

---

    [1]   The record also contains many sealed submissions both in support of and in
opposition to this motion.

## ALLEGATIONS AND PERTINENT BACKGROUND

This is a dispute between the assignees of PIP[2] benefits and an insurance company

over the company's practice of reducing policy limits from $10,000 to $2,500 based on an

opinion of a non-treating physician.  Plaintiffs contend that the Florida Motor Vehicle

No-Fault Law does not permit a non-treating physician to make an after-the-fact decision

that an injured claimant does not have an emergency medical condition.[3]  Although the

statute permits both treating and non-treating physicians and providers to make an

"affirmative EMC determination," Plaintiffs emphasize, it allows only treating physicians

and providers to make a "negative EMC determination."[4]  The basis of this lawsuit is that

---

[2]  PIP stands for personal injury protection under section 627.736 of the Florida Statutes (2013), which is the Florida Motor Vehicle No-Fault Law.

[3]  The term "emergency medical condition" is defined as follows:
> [A] medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably expected to result in any of the following:
> (a) Serious jeopardy to patient health.
> (b) Serious impairment to bodily functions.
> (c) Serious dysfunction of any bodily organ or part.
§ 627.732(16), Fla. Stat. (2013).

[4]  See docket 22, paragraph 45 ("[A] determination that a person did not have an emergency medical condition (a negative EMC determination) is one that can only be made by . . . ."), paragraph 46 ("[T]he list of medical professionals who are permitted to make an affirmative EMC determination is more broadly defined to include non-treating medical professionals, . . . ."), and paragraph 48 ("[T]he statutory scheme limits the people who can make a negative EMC determination only to treating providers, who actually provided initial or follow-up services to the insured.").

Defendants' after-the-fact "negative EMC determination" runs afoul of Florida statutory law.

On examination of the particular allegations of the second amended complaint, the three Plaintiffs are providers of chiropractic or medical services. The three insureds listed in the complaint voluntarily assigned their PIP benefits to one of the named Plaintiffs. Jacob Perez, insured by Progressive Select Insurance Company (Progressive Select), was involved in an automobile accident in July 2014.[5] Dr. Andrion, a chiropractor, of AA Suncoast treated him from July 2014 through October 2014, and Anthony Albert, M.D., gave him follow-up treatment beginning late September 2014.[6] In August 2014, without knowing whether an EMC determination had been made, Progressive Select requested and obtained an EMC peer review report conducted by David Karp. M.D.[7] Dr. Karp made a negative EMC determination, and benefits were limited to $2,500.

The second claimant, Antonia Blauch, was insured by Progressive American Insurance Company (Progressive American) when she was injured in a car accident on June 7, 2014.[8] She first received medical care from Baywest Chiropractic, and began receiving follow-up medical care from Robert M. Dean, M.D. of Tampa Bay Spine on

---

[5]  See docket 22, paragraphs 72-88.

[6]  See docket 118-1, paragraph 3; docket 22-8, page 6; and docket 22, paragraphs 75-77.

[7]  See docket 118-1, paragraphs 5-6.

[8]  See docket 22, paragraphs 89-105.

July 24, 2014.[9]  Progressive American received the affirmative EMC determination from

Dr. Dean on August 6, 2014.[10]  On August 11, 2014, at Progressive American's request,

Dr. Karp conducted a peer review and made a negative EMC determination.[11]

Progressive Select insured Leesa Johnson who suffered injuries in an automobile

accident on June 5, 2014.[12]  She received treatment that day from Spinal Correction

Centers continuing through mid-September 2014.[13]  In August 2014, she received follow-

up medical treatment from Amy Q. Liu, M.D.[14]  Despite the affirmative EMC

determination by Dr. Liu, Progressive Select chose to obtain a peer review by a physician

who made a negative EMC determination.[15]  Formal demand was sent and received in all

three cases.

The second amended complaint seeks injunctive and declaratory relief in Count I

and damages in Count II.  Count I specifically requests the following relief:

---

[9]  See docket 22, paragraphs 89-91.

[10]  See docket 118-1, paragraph 23.  Dr. Dean of Tampa Bay Spine determined she had an EMC on July 24, 2014, at a follow-up medical visit.  See docket 22, paragraph 92, Exh. 12.

[11]  See docket 118-1, paragraph 23.

[12]  See docket 22, paragraphs 106-121.

[13]  See docket 22, paragraphs 108 and 111; docket 118-1, paragraph 30.

[14]  See docket 22, paragraph 109.

[15]  See docket 22, paragraphs 113-116 and Exhibit 21; docket 118-1, paragraphs 34-36.  The parties disagree as to the timing of Progressive Selects' receipt of Dr. Liu's report.

a. A declaration finding that the language of the Progressive Defendants' insurance policy purporting to allow reduction to the amount of available PIP benefits through a negative EMC determination by any doctor, or other specified professional, who is not a "provider" that had provided initial or follow-up services to the injured insured is illegal and contrary to the applicable provisions of the Florida Motor Vehicle No-Fault Act;

b. A declaration finding that using the "EMC Peer Review" or EMC Paper Review process, or any other means, to reduce available PIP benefits by the Progressive Defendants violates the applicable provisions of the Florida Motor Vehicle No-Fault Act;

c. A declaration finding that the Progressive Defendants are not permitted, under the applicable provisions of the Florida Motor Vehicle No-Fault Act, to disregard an affirmative EMC determination.

d. Reinstating the full amount of PIP coverage, in the amount of $10,000, which should have been available under the affected policies.

e. Enjoining the Progressive Defendants from including provisions in their policies which purport to allow the above, illegal conduct;

f. Requiring the Progressive Defendants to inform all policyholders and providers who may have been affected by this improper conduct; and

g. Awarding to the Plaintiffs the costs and attorneys' fees made necessary by seeking this relief.[16]

---

[16] See docket 22, pages 37-38 (wherefore clause of Count I).

Count II seeks only damages for "unpaid reimbursements, under the full limits of PIP coverage, calculated pursuant to section 627.736."[17]

The resolution of this case, Plaintiffs contend, turns solely on the interpretation of section 627.736, Florida Statutes (2013) as applied to Defendants' practice of making unauthorized negative EMC determinations. Defendants routinely make the decision to reduce benefits either 1) after a treating physician or provider finds an emergency medical condition exists or 2) without knowing whether any determination has been made. According to Plaintiffs, this practice overlooks the statutory differentiation between providers who may make a negative EMC determination and those who may make an affirmative EMC determination. Specifically, subparagraph 3. provides for reimbursement of benefits up to $10,000 for "initial or follow-up services" as described in subparagraphs 1. and 2. if a physician, osteopath, physician assistant, or advanced registered nurse practitioner has determined that the injured person *had* an emergency medical condition. Fla.Stat. § 627.736(1)(a)3. (2013) (emphasis added).[18] Subparagraph

_____

[17] See docket 22, pages 39-40 (wherefore clause of Count II).

[18] Subparagraph 3. embodies the affirmative EMC determination as that term is used by Plaintiffs. Subparagraph 3. provides in full:

> Reimbursement for services and care provided in subparagraph 1. or subparagraph 2. up to $10,000 if a physician licensed under chapter 458 or chapter 459, a dentist licensed under chapter 466, a physician assistant licensed under chapter 458 or chapter 459, or an advanced registered nurse practitioner licensed under chapter 464 has determined that the injured person *had* an emergency medical condition.

Fla. Stat. § 627.736(1)(a)3. (2013) (emphasis added).

4. provides that reimbursements are limited to $2,500 "if a provider listed in subparagraph 1. or subparagraph 2. determines that the injured person *did not have* an emergency medical condition." Fla. Stat. § 627.736(1)(a)4. (2013) (emphasis added).[19] The crux of Plaintiffs' position is that the statute does not permit non-treating physicians or providers to determine a limitation of benefits per the plain language of the statute, but only providers described in subparagraphs 1. and 2. who deliver either initial or follow-up services can make such a determination.[20]

### Proposed Class

Plaintiffs seek certification of two classes.[21]  First, the Second Amended Class Complaint alleges declaratory and injunctive relief for the following class:

> A.  All Qualified Providers who: (i) received an assignment of benefits from a Claimant under a Progressive PIP policy, (ii) provided initial or follow up medical services to a

---

[19]  Subparagraph 4. sets forth the negative EMC determination at issue in this action.

[20]  The providers listed in subparagraphs 1. and 2. include a physician licensed under chapter 458 or chapter 459, a chiropractic physician licensed under chapter 460, a dentist licensed under chapter 466, and other articulated individuals under the circumstances set forth in the subparagraphs.  Fla. Stat. § 627.736(1)(a)1. and (1)(a)2. (2013).

[21]  Defendants are correct that Plaintiffs changed the class definition alleged in the second amended complaint by removing specific reference to The Progressive Corporation and defining "Progressive" to include only Progressive Select and Progressive American.  In doing so, Defendants argue that Plaintiffs have conceded The Progressive Corporation is improperly joined.  See docket 118, pages 2 and 15.  Without more, the Court will not revisit this issue and finds that the purported class definition does not waive inclusion of The Progressive Corporation as a party Defendant in this action.

Claimant after January 1, 2013, and (iii) were given notice by Progressive that available PIP benefits were reduced to $2,500 because of a Negative EMC Determination that Progressive obtained from a Non-treating Provider; and

B.   All Claimants who were notified that Progressive reduced available PIP benefits to $2,500 because of a Negative EMC Determination Progressive obtained from a Non-treating Provider.

As a second subclass Plaintiffs seek monetary damages for breach of contract for the following:

All Qualified Provider Class Members: (i) who were not paid in full for their services, (ii) who made a pre-suit demand to Progressive for payment pursuant to §627.736(10), and (iii) where Progressive received documentation from a duly licensed physician, dentist, physician's assistant or advanced registered nurse practitioner that the Claimant had an Emergency Medical Condition.

As articulated by the Plaintiffs as part of the class definition, the term "Qualified Provider" is a provider described by section 627.736(1)(a) of the Florida Statutes. "Progressive" means Progressive Select Insurance Company and Progressive American Insurance Company.  "Claimant" is an injured person who received medical services for injuries sustained in an accident within 14 days from a Qualified Provider.  "Non-treating Provider" means a person or entity that did not provide initial or follow-up treatment as defined by section 627.736(1)(a)1. or 2. to a Claimant.  "Negative EMC Determination" is a determination that a Claimant did not have an Emergency Medical Condition.

## DISCUSSION

Plaintiffs allege this case as one addressing coverage[22] while Defendants

characterize it as challenging authorized claims-handling procedures.[23]  Defendants

challenge Plaintiffs' interpretation of Florida's no-fault law as leading to absurd results

because insurance companies could never undo a negative EMC determination, whereas

Plaintiffs argue that the plain language of the statute cannot be ignored in giving only

specific treating providers the power to make negative EMC determinations.[24]  Plaintiffs

assure this Court that they seek no damages in their count for declaratory and injunctive

relief as reflected in the allegations and wherefore clause of Count I of the second

amended complaint.[25]  Defendants rely on cases to assert that in almost all, if not all, PIP

cases seeking declaratory and injunctive relief, the predominance requirement of Rule

---

[22]  "This is an insurance coverage case in which Plaintiffs challenge Progressive's systemic practice of reducing PIP policy limits from $10,000 to $2,500 by relying on opinions it obtains from non-treating providers that injured claimants do not have an emergency medical condition and thereafter suspending all claims handling."  See docket 121, pages 2-3, citing docket 118, pages 3-6.

[23]  Notably, Plaintiffs have not had the opportunity to review the heavily redacted materials regarding the claims-handling procedure.  See docket 121, page 2.

[24]  "It is Defendants' position (see docket 32) that this reading of the statute yields an absurd result at odds with legislative intent."  See docket 118, page 5.

[25]  "Plaintiffs seek no monetary relief for those members of the Class entitled only to declaratory and injunctive relief because they have not made a formal PIP demand.  By definition, because the relief sought is simply to resume claims-handling with full policy limits restored or capable of being restored, Progressive – not the Court – will be making these claims-handling determinations in the ordinary course of its resumed claims process."  See docket 121, page 5.

23(b)(2) and (3) cannot be met because the individual damage claims predominate the claim for equitable relief. Defendants urge that their defenses almost automatically remove an action involving PIP benefits from ever conceivably meeting the requirements for class certification.[26] Against this backdrop, the Court analyzes each requirement for certifying a class.

### *Standing*

The first step in the examination of class certification begins with constitutional standing, which must be determined before any consideration of the four requirements set forth in Federal Rule of Civil Procedure 23(a). Prado-Steiman v. Bush, 221 F.3d 1266, 1280 (11th Cir. 2000) (citing Griffin v. Dugger, 823 F.2d 1426, 1482 (11th Cir. 1987)). The named plaintiffs must have standing to raise the issues before a determination of their representative capacity is made. Prado-Steiman, 221 F.3d at 1280 (citing Griffin). At least one named class representative must have Article III standing to raise each class subclaim. Prado-Steiman, 221 F.3d at 1279-80. A plaintiff must show that he "personally suffered" the "same injury" as others in the class. Veal v. Crown Auto

---

[26] In rebuttal to Defendants' argument that its defenses will be lost, Plaintiffs state that they "do not contend that Progressive will forfeit its right to evaluate and process Class Members' claims under the applicable provisions of the PIP statute in a restored claims process." See docket 121, page 6. Further, "Plaintiffs seek for all involved – insureds, providers, and Progressive alike – to be returned to the position that they were in prior to the unlawful reduction in coverage and suspension of claims-handling, with all of their respective rights an duties intact pursuant to the PIP statute." See docket 121, page 6.

Dealerships, Inc., 236 F.R.D. 572, 577 (M.D. Fla. 2006) (quoting Prado-Steiman, 221 F.3d at 1279).

The named Plaintiffs as the assignees of the insureds have standing to seek declaratory and injunctive relief. The insureds' PIP benefits were reduced to $2,500 after a negative EMC determination by Defendants. The insureds and their assignees have been injured through the loss of full coverage as a result of Defendants' practice of reducing benefits after using non-treating providers in contravention to the Florida statutory law, according to Plaintiffs. The assignees are the owners of the accounts receivables. The sole owners of AA Suncoast and Tampa Bay Spine are doctors actively engaged in providing medical services in successor entities that they own.[27] As noted by Plaintiffs, the injunctive relief sought under Chapter 86 of the Florida Statutes is not limited to prospective relief, but includes a return to the status quo where claims-handling would be restored and their bills processed.[28]

---

[27] See sealed docket 111, Exhibit 1, pages 21-22 and 200-202; and sealed docket 111, Exhibit 2, pages 1-15; 127-28; and 138-141.

[28] Defendants' position that the affirmative EMC determination was not received until after this litigation was initiated is highly contested. According to Defendants' chart, it received documentation of the EMC determination for AA Suncoast's patient, Mr. Perez, on June 2, 2015. This action was initially filed in state court on September 10, 2015. See docket 118, page 3. In any event, it is irrelevant for purposes of a class definition whether Defendants had received an affirmative EMC determination before reducing benefits because "Plaintiffs are asking this Court to return the parties to their original positions before Progressive wrongfully reduced coverage." See docket 121, pages 11-12.

With respect to the subclass seeking damages, the insureds and their assignees have suffered injury as a result of the Defendants' breach of the insurance policies. The Plaintiffs have not been reimbursed for initial or follow-up services for the full $10,000 available under Florida law as incorporated into the policies. Each Plaintiff provided a pre-suit demand for payment pursuant to the PIP statute. The Plaintiffs allege and attach the pre-suit demand letter for all three named Plaintiffs.[29] In all three instances, Defendants responded in writing to the formal demand letters and state, in the answer, that the responses speak for themselves.[30] Defendants do not deny that they received the demand letters or that they responded. Having established injury, the Plaintiffs have standing to seek damages on behalf of the subclass.

## *Adequate Definition and Ascertainability*

The next consideration, deemed implicit in Rule 23(a), is to evaluate whether the class is "adequately defined and clearly ascertainable." Bussey v. Macon Cnty. Greyhound Park, Inc., 562 F. App'x 782, 787 (11th Cir. 2014) (unpublished) (citing Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1304 (11th Cir. 2012) (other citations omitted)).[31]

---

[29] See docket 22, paragraph 84, Exhibit 8; docket 22, paragraph 101, Exhibit 16; and docket 22, paragraph 117, Exhibit 22.

[30] See docket 36, paragraph 85; docket 36, paragraph 102; and docket 36, paragraph 118.

[31] See also Randolph v. J.M. Smucker Co., 303 F.R.D. 679, 684-85 (S.D. Fla. 2014) (quoting Little and Bussey); Rink v. Cheminova, Inc., 203 F.R.D. 548, 659 (M.D. Fla. 2001).

The class is identifiable if "its members can be ascertained by reference to objective criteria." <u>Bussey</u>, 562 F. App'x at 787 (citations omitted).  The identification process must be "administratively feasible" or "a manageable process that does not require much, if any, individual inquiry."  <u>Id.</u>

Defendants' records, data, and electronic systems, which has been described in sealed documents, satisfy the objective criteria necessary to ascertain the class members.  All of the information necessary to identify the class members is contained in the claims files.[32]  The inquiry does not require a highly individualized assessment of the insureds because the information pertaining to whether a negative EMC determination was made and whether the benefits were reduced to $2,500 is readily accessible from Defendants' files.[33]  Likewise, the subclass does not require individual inquiry as it consists of qualified providers who were not paid in full for their services and made a pre-suit demand to Defendants in situations where a Progressive entity received documentation from the necessary provider that an emergency medical condition existed.

Defendants' contention that class membership cannot be identified from Defendants' records alone or that it will be administratively unworkable to do so, does not rebut Plaintiffs' showing to the contrary.  The identification of the class would not require compelling records from a third party entity or employing self-identification methods

---

[32]  <u>See</u> sealed docket 77-5, pages 137-138.

[33]  <u>See</u> sealed docket 77-5, pages 137-138.

through affidavits as was the case in <u>Karhu v. Vital Pharmaceuticals, Inc.</u>, 621 F. App'x

945, 948 (11th Cir. 2015) (unpublished).[34]  Similarly, Plaintiffs have not merely pointed to

Defendants' computer system, as was the case in <u>Christie v. Bank of Am.</u>, 2016 WL

654818, at *8 (M.D. Fla. 2016), <u>adopted</u>, 2016 WL 633796 (M.D. Fla. 2016).  Plaintiffs

have set forth a reasonable explanation of why they believe this information may be

extracted from Defendants' records without undue difficulty.[35]  The purported class may

be ascertained from claim files, electronic data, and the systems used to collect, maintain,

and store the data.

### *Rule 23(a) Requirements*

Once the preliminary factors have been met, each of the four requirements set forth

in Rule 23(a) and at least one of the requirements in Rule 23(b) must be satisfied to

---

[34]  In <u>Karhu</u>, the drug companies sold mainly to distributors and retailers and not
to consumers directly and, therefore, the company records would not reveal the end-
purchasers of the dietary supplement known as VPX Meltdown Fat Incinerator.

[35]  This is not a situation where class identification must be determined from
insufficient records.  <u>See</u> <u>Riffle v. Convergent Outsourcing, Inc.</u>, 311 F.R.D. 677, 680
(M.D. Fla. 2015) (denying class certification in claim for violation of federal debt
collection statute where defendant or original lender would be required to ascertain
whether purported class member procured loan for personal, family, or household
purposes). Neither is this a situation where it is overly burdensome to determine whose
benefits were reduced based on a negative EMC determination.  <u>See</u> <u>Walewski v.
Zenimax Media, Inc.</u>, 502 F. App'x 857, 861 (11th Cir. 2012) (unpublished) (affirming the
denial of class certification of claim for violations of deceptive trade practices in the sale
of a popular video game with a flaw because the class was not adequately defined; culling
class members who actually suffered defect in game from millions of game owners who
may or may not purchased game from defendants was "especially difficult" where class
was defined as all persons or entities in United States who purchased any version of the
game, whether or not the game contained the flaw).

certify a class.  <u>Vega v. T-Mobile USA, Inc.</u>, 564 F.3d 1256, 1265 (11th Cir. 2009)

(citations omitted).

### Rule 23(a)(1) – Numerosity

Progressive American underwrote PIP policies for more than 3,800 claimants who

received a reduction in coverage benefits as a result of Progressive's negative EMC

practices.  More than 3,000 claimants received a reduction in coverage in PIP policies

underwritten by Progressive Select for the same practices.[36]  These almost 7,000

claimants do not include anyone who stopped treatment upon discovering that $2,500 was

the maximum amount of benefits after the negative EMC determination.  The damages

subclass includes about 450 providers.  Although the Defendants contend that these

numbers are not precise, the Court finds that Plaintiffs have carried their burden to show

that the number of potential plaintiffs is so high as to make joinder impracticable.

### Rule 23(a)(2) and (a)(3) – Commonality and Typicality

Commonality and typicality are often considered together because the aspects of

each overlap.  <u>Prado-Steiman</u>, 221 F.3d at 1278; <u>Hudson v. Delta Air Lines, Inc.</u>, 90 F.3d

451, 456 (11th Cir. 1996).  While commonality involves group characteristics, typicality

refers to individual characteristics of the class representatives in relation to the class.

<u>Prado-Steiman</u>, 221 F.3d at 1279.  Commonality refers to "questions of law or fact

common to the class" which will "produce a common answer" to one issue central to all

---

[36]  <u>See</u> docket 80-3, pages 3-10; sealed docket 77-5, pages 185-86 and 209.

the class claims. <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 349-360, 131 S. Ct. 2541, 2551-2557, 180 L.Ed.2d 374 (2011). It does not mean that all questions of law and fact must be common to all class members. <u>Vega</u>, 564 F.3d at 1268. Thus, factual differences may exist between class members' claims without defeating certification, provided common questions of law exist. Satisfying the commonality requirement is measured by the standard of a "low hurdle" under Rule 23(a)(2) with the plaintiff's burden described as "relatively light." <u>See</u> <u>Williams v. Mohawk Indus., Inc.</u>, 586 F.3d 1350, 1356 (11th Cir. 2009) (describing standard as "low hurdle"); <u>Wal-Mart Stores, Inc.</u>, 131 S.Ct. at 2551 (describing burden as "relatively light").

Typicality requires a showing that the plaintiffs' individual claims are typical of the claims of the class members. The same interest must be shared and same type of injury must be suffered by the plaintiffs and the class members. <u>See</u> <u>Busby v. JRHBW Realty, Inc.</u>, 513 F.3d 1314, 1322 (11th Cir. 2008). The Court finds that both the commonality and typicality requirements have been met.

Defendants' practice of using negative EMC determinations from non-treating providers to reduce PIP benefits from $10,000 to $2,500 hinges on the issue of whether such practice is lawful under the PIP statute. The class representatives and members suffered the same loss of $7,500 of available PIP coverage. Defendants' argument that liability in this case is dependent on individualized proof ranging from different insureds, accidents, medical providers, injuries, and EMC providers, to different claims adjusting

decisions, damages, and defenses, does not change the fact that it is unnecessary to resolve all of these factual differences to resolve the single issue at hand. Moreover, the absence of a uniform claims-handling procedure for PIP medical benefits does not prevent a determination of class membership, liability, and damages.

### Rule 23(a)(4) – Adequate Representation

The Court finds that no conflicts of interest exist between the named Plaintiffs and their counsel and other members of the class. The Court further finds that the class representatives' interests are aligned with the class because both suffered from Defendants' practice, and class counsel are more than adequate to vigorously prosecute the action on behalf of the class. See Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1323 (11th Cir. 2008) (stating the two inquiries for adequate representation as conflict of interest and adequacy of representatives to prosecute action).

### *Rule 23(b) Requirements*

After having met the four prerequisites under Rule 23(a), Plaintiffs must also satisfy at least one of the alternative requirements of Rule 23(b). Plaintiffs seek to establish a hybrid certification under Rule 23(b)(2) for declaratory and injunctive relief, and under Rule 23(b)(3) for damages.

### Rule 23(b)(2) – Declaratory and Injunctive Relief (Count I)

Rule 23(b)(2) provides for certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" A declaratory or injunctive relief class under Rule 23(b)(2) requires a showing that "the predominant relief sought is injunctive or declaratory." Murray v. Auslander, 244 F.3d 807, 812 (11th Cir. 2011); DWFII Corp. v. State Farm Mut. Auto. Ins. Co., 469 F. App'x 762, 765 (11th Cir. 2012) (unpublished) (citing Murray). Monetary relief is deemed to predominate "unless it is incidental to the requested injunctive or declaratory relief." Murray, 244 F.3d at 812; DWFII Corp., 469 F. App'x at 765. Incidental means that the class members have an automatic right to damages once liability is found without complex individual determinations. Murray, 244 F.3d at 812; DWFII Corp., 469 F. App'x at 765.

The issue here is whether monetary damages are incidental to declaratory and injunctive relief. Many courts have found that cases involving reimbursements under the PIP statute or cases involving a reduction of medical benefits are inappropriate for class certification. See DWFFI Corp. (affirming denial of class certification of claim that insurance company violated Florida's No-Fault law by using Medicare and Medicaid's National Correcting Coding Initiative (NCCI) edits to limit reimbursement because, among other factors, monetary relief was not incidental to equitable relief).[37] None of

---

[37] See also Cielo v. Garrison Prop. & Cas. Ins. Co., No. 8:15-cv-2324-T-23TBM, 2016 WL 1244552 (M.D. Fla. Mar. 30, 2016) (denying class certification of claim that insurance company violated PIP statute by limiting reimbursement for medical payments based on Medicare fee schedules and relying on DWFFI Corp.); Bailey v. Rocky Mountain Holdings, LLC, 309 F.R.D. 675 (S.D. Fla. 2015) (denying class certification of

these cases, however, involve the precise section of the PIP statute at issue here, but rather generate from the "reasonableness" standard in the statute, which is usually a highly individual assessment. They do not mention whether the plaintiffs desired to be returned to their earlier positions, as in this case, before the claims-handling process was halted on their claims. All appear to involve the court's supervision in resolving each individual's damages claim, which was most often found not to be incidental to the equitable claim.

Here, the issue does not focus on the claims-handling process, but on Defendants' initial negative EMC determination. Plaintiffs have assured this Court that once the legal issue is determined, there will be no more supervision required to determine individual damages. Consequently, the Court finds the class certification at this juncture to be appropriate.

---

claim that emergency transportation operators violated PIP statute by billing in excess of statutory limits because monetary relief was not incidental but individualized, depending on each class member's insurance policy and exhaustion of benefits); All Family Clinic of Daytona Beach Inc. v. State Farm Mut. Auto. Ins. Co., 280 F.R.D. 688 (S.D. Fla. 2012) (denying class certification of claim that insurance company violated Florida's No-Fault law by improperly reducing or denying reimbursement for MRIs based on the "reasonableness" of each charge because individual issues predominated under Rule 23(b)(3)); Folks v. State Farm Mut. Auto. Ins. Co., 281 F.R.D. 608 (D. Colo. 2012) (denying class certification in claim for insurance company's violations of Colorado's No-Fault statute because Plaintiffs sought declaration of rights and liabilities under each class member's contract of insurance which requires individualized analysis); Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co., 271 F.R.D. 538 (S.D. Fla. 2010) (denying class certification in claim that insurance company violated Florida's No-Fault law by using Medicare and Medicaid's NCCI edits to limit reimbursements because, among other factors, typicality was lacking).

**Rule 23(b)(3) – Predominance and Superiority of Subclass Claim (Count II)**

Rule 23(b)(3) encompasses the "predominance" and "superiority" aspects of a class. To satisfy this alternative, there must be a finding that "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The predominance requirement "is far more demanding than Rule 23(a)'s commonality requirement." Jackson v. Motel 6 Multipurpose, Inc., 130 F. 3d 999, 1005 (11th Cir. 1997). The predominance analysis has a "tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1184 (11th Cir. 2010) (citations omitted).

Having painstakingly examined why the Class is certifiable based on the absence of the need to make individualized assessments, the Court refrains from certifying the subclass seeking damages which to some degree would require such management.

It is **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Class Certification (Dkt. 80) is **granted in part and denied in part**. The following Class is hereby certified:

> A. All Qualified Providers who: (i) received an assignment
> of benefits from a Claimant under a Progressive PIP policy,

(ii) provided initial or follow up medical services to a Claimant after January 1, 2013, and (iii) were given notice by Progressive that available PIP benefits were reduced to $2,500 because of a Negative EMC Determination that Progressive obtained from a Non-treating Provider; and

B.   All Claimants who were notified that Progressive reduced available PIP benefits to $2,500 because of a Negative EMC Determination Progressive obtained from a Non-treating Provider.

The term "Qualified Provider" is a provider described by section 627.736(1)(a) of the Florida Statutes.  "Progressive" means Progressive Select Insurance Company and Progressive American Insurance Company.  "Claimant" is an injured person who received medical services for injuries sustained in an accident within 14 days from a Qualified Provider.  "Non-treating Provider" means a person or entity that did not provide initial or follow-up treatment as defined by section 627.736(1)(a)1. or 2. to a Claimant.  "Negative EMC Determination" is a determination that a Claimant did not have an Emergency Medical Condition.

**DONE AND ORDERED** at Tampa, Florida, on May 16, 2017.


   *s/Richard A. Lazzara*
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


COPIES FURNISHED TO:
Counsel of Record